**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

——————————————————————— x

Sonia Cauchi, individually on behalf of herself and all others similarly situated,          :
:
:    Case No. 15-cv-4199-MKB-MDG
:
Plaintiff,          :
v.          :
:    **AMENDED**
Nature's Bounty, Inc., NBTY, Inc.,          :    **CLASS ACTION COMPLAINT**
:
Defendants.          :    **<u>JURY TRIAL DEMANDED</u>**
:
:
:
:

——————————————————————— x

Plaintiff, individually and on behalf of all others similarly situated, by her attorneys, alleges the following upon information and belief, except for those allegations pertaining to Plaintiff, which are based on personal knowledge:

**<u>NATURE OF THE ACTION</u>**

1.    Defendant Nature's Bounty, Inc. (hereinafter "Nature's Bounty"), and its parent company Defendant NBTY, Inc. (hereinafter "NBTY") manufacture, market and sell nationwide a black cohosh supplement, Nature's Bounty's Black Cohosh 540 mg (the "Product"). Defendants market the Product as a "natural," "non-synthetic" remedy for the symptoms of menopause that is made "us[ing] only the finest quality herbs and spices." Defendants represent that the Product "Helps [to] Alleviate Hot Flashes, Night Sweats and Mild Mood Changes" and that "Studies document Black Cohosh's ability to help support the physical changes that occur in a woman's body over time." Contrary to Defendants' claims, each of these representations is false and/or misleading.

1

2.    Every reliable study of black cohosh has demonstrated that it is no better than a placebo at relieving the symptoms of menopause.  Even if black cohosh was more than a placebo, the studies that purport to demonstrate a benefit to black cohosh consumption were performed using substantially different formulations of black cohosh and would not be relevant to any possible benefits of consuming the Product, especially since the Product does not even contain the levels of the active ingredient it purports to have as verified by independent laboratory testing.  Nor is the Product "natural" or "non-synthetic" as Defendants represent given that it contains magnesium stearate, a synthetic ingredient that may impair the body's immune response to cancer.

3.    The Product's label also omits entirely that it is contaminated with unsafe levels of lead, which is a powerful neurotoxin that is known to cause cognitive deficits, mental illness, dementia, and hypertension.  The Product's contamination is particularly egregious given the potentially severe and irreversible consequences of lead consumption, as well as the fact that only less than a year ago an infant died as a result of consuming one of Defendant NBTY's contaminated products.  Given Defendants' deplorable conduct, Plaintiff  Sonia Cauchi ("Plaintiff") brings this action against Defendants on behalf of herself and all consumers ("Class Members") who purchased the Product at any time throughout the statute of limitations period up to and including the present (the "Class Period").

## FACTUAL BACKGROUND

**The Supplements Industry**

4.    The herbal and nutritional supplements industry is big business.  American consumers are health conscious and are increasingly turning to supplements to prevent and treat

illness.[1]  In 2013, dietary supplement sales throughout the United States totaled $35 billion.[2] Herbal supplement sales have increased every year for the past ten years.[3]  Sales growth for black cohosh has been particularly strong; with sales for the year 2013 up nearly 13% from the previous year.[4]  This sales growth in the herbal supplements industry reflects consumers' beliefs that "natural, herbal remedies" are safer, healthier alternatives to synthetic medicines.[5]

5.      Conditions in the industry have created the perfect storm for unscrupulous supplement makers, like Defendants, to take advantage of consumers.  The reasonable consumer lacks the equipment and specialized knowledge and training necessary to test supplement makers' claims and to evaluate the safety of their products.  The Food and Drug Administration ("FDA") lacks the resources to enforce its laws against most supplement makers.  Thus, companies drawn to the industry by increasingly attractive sales numbers are able to gain market share and increase their profits by misleading consumers about the quality and benefits of consuming their product(s).[6]  Defendants' deceptive acts and practices and false advertising exemplify this ongoing epidemic that has plagued consumers throughout the country.

---

[1] Ng, Serena and Rockoff, Jonathan D., *With Top Lines Drooping, Firms Reach for Vitamins*, WALL STREET JOURNAL (Mar. 31, 2013, 7:25 PM), http://www.wsj.com/articles/SB10001424127887324392804578362073624344816.

[2] Link, Connor, *The State of Supplement Sales in 2014*, NEWHOPE360 (Nov. 5, 2014), http://newhope360.com/supplements/state-supplement-sales-2014.

[3] Lindstrom, Ash, ET AL, *Sales of Herbal Dietary Supplements Increase by 7.9% in 2013, Marking a Decade of Rising Sales:  Tumeric Supplements Climb to Top Ranking in Natural Channel*, HERBALGRAM – THE JOURNAL OF THE AMERICAN BOTANICAL COUNCIL (2014), http://cms.herbalgram.org/herbalgram/issue103/HG103-mkrpt.html, (and attached hereto as Ex. A at 1)

[4] *Id.* at 3.

[5] Lauren F. Friedman, *Outside In:  But It's All Natural! Do we have an Instinctive Preference for Herbal Remedies?* PSYCHOLOGY TODAY (Mar. 12, 2013), https://www.psychologytoday.com/articles/201303/outside-in-its-all-natural.

[6] *The Dangers of Dietary and Nutritional Supplements Investigated What You Don't Know About These 12 Ingredients Could Hurt You*, CONSUMER REPORTS (last updated Sept. 2010), http://www.consumerreports.org/cro/2012/05/dangerous-supplements/index.htm; Harmon, Katherine, *Herbal Supplement Sellers Dispense Dangerous Advice, False Claims*, SCIENTIFIC AMERICAN (May, 28, 2010), http://www.scientificamerican.com/article/herbal-supplement-dangers/.

3

**Defendants' Claims Regarding the Benefits of Consuming the Product are False and Misleading**

6.       Defendants market the Product as a remedy for the symptoms of menopause. As is displayed on the following two pages, the Product's labeling represents that it "Helps [to] Alleviate Hot Flashes, Night Sweats and Mild Mood Changes." *See* Ex. B at 1; *see also* Ex. C (image of the Product's label from Nature's Bounty's website). The Product's labeling also represents that "As one of the leading herbs for women's health, Black Cohosh is famous for its ability to promote menopausal health. Studies document Black Cohosh's ability to help support the physical changes that occur in a woman's body over time." *See* Exs. B at 3-4, C. Defendants make the same representations about the Product on Nature's Bounty's website. *See* Ex. C.







7.      Defendants make these claims despite the fact that there are no scientifically sound, reliable studies demonstrating that black cohosh can provide any of these benefits.  In fact, all the reliable studies of black cohosh have demonstrated that it does *no*t help to alleviate hot flashes, night sweats, mild mood changes, or any other symptoms of menopause.  For example:

a.      In 2006, the Annals of Internal Medicine published a report on a one year, randomized, double-blind, placebo-controlled trial entitled "Treatment of Vasomotor Symptoms of Menopause with Black Cohosh, Multibotanicals, Soy, Hormone Therapy, or Placebo."  The trial found that black cohosh performed no better than a placebo at alleviating the symptoms of menopause, including night sweats, hot flashes, depression, anxiety, irritability, nervousness, sleep disturbance, fatigue, vaginal dryness, headaches, muscle/joint pain, headache, breast tenderness, palpitations or dizziness/fainting. Katherine M. Newton, PhD et al., *Treatment of Vasomotor Symptoms of Menopause with Black Cohosh, Multibotanicals, Soy, Hormone Therapy, or Placebo*, ANNALS OF

6

INTERNAL MEDICINE at 871-72, 875-76 (2006).  The trial was funded by the United States National Institutes of Health ("NIH").  *Id*. at 871.

b.      A follow up study, which was also funded by the NIH, found that black cohosh had no effect on reproductive hormones, vaginal epithelium, or on the endometrium.  Susan D. Reed, MD, MPH, et al., *Vaginal, Endometrial, and Reproductive Hormone Findings:  Randomized, Placebo-Controlled Trial of Black Cohosh, Multibotanical Herbs, and Dietary Soy for Vasomotor Symptoms: the Herbal Alternatives for Menopause (HALT) Study*, 15 MENOPAUSE: THE JOURNAL OF THE NORTH AMERICAN MENOPAUSE SOCIETY 51, 51 (2008).

c.      In 2009, Menopause: The Journal of The North American Menopause Society, published a report on a randomized, double-blind, placebo-controlled clinical trial entitled "Safety and Efficacy of Black Cohosh and Red Clover for the Management of Vasomotor Symptoms: a Randomized Controlled Trial" which was conducted by the Department of Obstetrics and Gynecology, Center for Research on Women and Gender, College of Medicine, at the University of Illinois at Chicago.  The trial concluded that black cohosh was no better than a placebo at relieving the symptoms of menopause, including hot flashes, night sweats, mild mood changes, insomnia, joint pain, or fatigue.  Stacie E. Geller, PhD et al., *Safety and Efficacy of Black Cohosh and Red Clover for the Management of Vasomotor Symptoms: a Randomized Controlled Trial*, 16 MENOPAUSE: THE JOURNAL OF THE NORTH AMERICAN MENOPAUSE SOCIETY 1156, 1160-63 (2009).  The study was supported by an NIH grant.  *Id*. at 1156.

d.      In June 2009, The Journal of Clinical Oncology published a report on a trial entitled "Phase III Double-Blind, Randomized, Placebo-Controlled Crossover Trial

of Black Cohosh in the Management of Hot Flashes:  NCCTG Trial N01CC."  The trial

found no benefit to black cohosh consumption as compared to placebo for alleviating hot

flashes, excessive sweating, negative mood swings, nausea, joint or muscle pain, chills

headache, nervousness, stomach cramps, dizziness or heaviness in legs.  Barbara A.

Pockaj et al., *Phase III Double-Blind, Randomized, Placebo-Controlled Crossover Trial

of Black Cohosh in the Management of Hot Flashes: NCCTG Trial N01CC*, 24 JOURNAL

OF CLINICAL ONCOLOGY 2836, 2837-40 (2006).  The trial was supported by a number of

Public Health Service grants.  *Id*. at 2836.

       e.     Every credible, reliable, scientifically sound study on the efficacy of black

cohosh has shown that it does not alleviate hot flashes, night sweats, mild mood changes

or any other symptom of menopause.  The Cochrane Review is regarded as the best

single source of information on the safety and efficacy of health interventions.  In 2012,

the Cochrane Review published the most comprehensive meta-analysis and systematic

review of studies of the efficacy of black cohosh for relieving the symptoms of

menopause.  The review found that black cohosh was no better than a placebo at

alleviating hot flashes or night sweats associated with menopause.  Matthew J. Leach,

Vivienne Moore, *Black Cohosh (Cimicifuga spp.) for Menopausal Symptoms*, COCHRANE

DATABASE OF SYSTEMATIC REVIEWS at 2, 4, 7, 9-12, 31-32, 39-48 (Sept. 12, 2012).

8.     All of the studies that have claimed to show benefits from black cohosh

consumption were unreliable.  They suffered from, *inter alia*, the absence of placebo control

groups, small sample sizes, short duration, bias, lack of allocation concealment, contamination,

flaws in the handling of incomplete data, and most were funded by the same black cohosh

manufacturer and tested only that manufacturer's distinct formulation of black cohosh, which is

8

different than the formulation used in the Product.  *See* Katherine M. Newton et al., *The Herbal Alternatives for Menopause (HALT) Study: Background and Design*, MATURITAS: THE EUROPEAN MENOPAUSE JOURNAL, at 135 (2005); Pockaj, *supra* ¶ 7d., at 2839-40; Leach, *supra* ¶ 7e., at 3, 11-12, 26-34.  "Placebo control is critical in trials of menopause symptoms because of the natural regression of symptoms over time, the likelihood of a significant placebo effect, and the phenomenon of regression to the mean which occurs when a certain frequency of symptoms is required for study entry."  Newton, *supra* ¶ 8, at 135.  The Cochrane Review found that participants who received only the placebo in black cohosh clinical trials consistently reported that their menopausal symptoms had improved.  Leach, *supra* ¶ 7e.

9.     All of the reliable studies on black cohosh demonstrate that it does not help to alleviate hot flashes, night sweats, mild mood changes, or any other symptoms of menopause. Accordingly, all reasonable experts in the field agree that Defendants' representations that black cohosh "Helps [to] Alleviate Hot Flashes, Night Sweats and Mild Mood Changes[,]" and that "Studies document Black Cohosh's ability to help support the physical changes that occur in a woman's body over time" are false and/or misleading.

10.     Furthermore, all of the studies that purport to demonstrate a benefit to black cohosh consumption were done using substantially different formulations of black cohosh than that used in the Product.  Most of the studies that claim to demonstrate a benefit to black cohosh consumption were sponsored by Schaper and Bruemmer, the German supplement maker that manufactures and sells Remifemin, a standardized black cohosh extract.  These studies tested the effects of the proprietary black cohosh formulation used in Remifemin, which is a standardized 40 mg 40% isopropalonic extract of the roots and rhizomes of black cohosh.  The older Remifemin trials tested the earlier formulation of Remifemin, which was a standardized 40 mg

60 % ethanolic extract of the roots and rhizomes of black cohosh.[7]  *See* Leach, *supra* ¶ 7e., at 26;
Pockaj, *supra* ¶ 7d., at 2837.

11.     Other unreliable studies that purportedly demonstrated benefits of black cohosh
consumption were sponsored by German supplement maker Bionorica, which also tested its own
proprietary black cohosh product, Klimadynon, which is a 40 mg standardized ethanolic extract
of the roots and rhizomes of black cohosh.[8]  The rest of the unreliable studies that claimed to
show a benefit to black cohosh consumption used standardized isopropalonic or ethanolic
extracts similar to those used in Remifemin or Klimadynon   *See Id*.

12.     None of the studies that purport to show a benefit to black cohosh consumption
tested black cohosh supplements that were formulated like the Product.  *See* Leach, *supra* ¶ 7e.
The Product is not standardized, and is not an isopropalonic or ethanolic extract.  *See* Exs. B, C.
The Product also is not made from the rhizomes of black cohosh, but is made only from the root.
*See* Exs. B, C.  The dosage of black cohosh used in the Product is also substantially different
than the dosage of black cohosh used the studies that purport to demonstrate benefits to black
cohosh consumption.  *See Id*.  Finally, as is explained more fully in the next section, the Product
is contaminated with unsafe levels of lead.  *See* Ex. G at 5, 12.  For all of these reasons, all
reasonable experts in the field would agree that the purportedly positive black cohosh trials and
studies, even if, *arguendo*, they were reliable, would not be a reliable indicator of the benefits of
consuming the Product.

13.     It is therefore misleading for Defendants to represent that "Studies document"
Defendants' representations regarding the benefits of consuming the Products.  These

---

[7] *See Frequently Asked Questions*, REMIFEMIN (last accessed June 24, 2015),
https://www.remifemin.com/Products/Remifemin.aspx.
[8] *Active Herbal Substances in Klimadynon/Uno*, Bionorica (last accessed June 24, 2015),
http://english.bionorica.de/gynaecology/klimadynon®-uno/active-herbal-substances-in-klimadynon®-uno.html.

representations mislead reasonable consumers into believing that the referenced studies are actually relevant to the Product.

14.     Plaintiff and Class Members read and relied on Defendants' representations about the benefits of consuming the Product, and purchased it at a premium price based thereon.  Had Plaintiff and Class Members known the truth about the Product, they would not have been willing to purchase it at a price premium.

**The Product is Contaminated with Lead**

15.     In addition to Defendants' misrepresentations regarding the benefits of consuming the Product, Defendants also misrepresent that it is made "us[ing] only the finest quality herbs and spices." (*See* Ex. B at 3-4)  The Product's label and advertisements omit entirely that it is contaminated with lead.  *See* Exs. B at 1-4, C.

16.     An independent laboratory was retained to test the Product.  The results revealed that the Product is contaminated with unsafe levels of lead.  Each capsule contains 0.41091 micrograms of lead.  *See* Ex. G at 5, 12.

17.     Lead is a powerful neurotoxin.  There is no safe blood level of lead.[9]  Further exacerbating the health risks posed by the Product is the fact that its label instructs consumers to take it every day.  *See* Exs. B at 2, C.  Lead consumption has been shown to reduce intelligence, and to increase the risk of mental illness, dementia, hypertension, arrhythmia and breast cancer.[10]

---

[9] *CDC – Lead – Tips – Sources of Lead – Folk Medicine*, CENTERS FOR DISEASE CONTROL AND PREVENTION (Oct. 15, 2013), http://www.cdc.gov/nceh/lead/tips/folkmedicine.htm.

[10] Maryse F. Bouchard, PhD et al., *Blood Lead Levels and Major Depressive Disorder, Panic Disorder, and Generalized Anxiety Disorder in US Young Adults*, 66 ARCHIVES OF GENERAL PSYCHIATRY 1313, 1317 (Dec 2009); Marc G. Weisskopf et al., *Cumulative Lead Exposure and Prospective Change in Cognition Among Elderly Men*, 160 AMERICAN JOURNAL OF EPIDEMIOLOGY 1184, 1185, 1188, 1190-91 (2004); Olusegun I. Alatise, Gerhard N. Schrauzer, *Lead Exposure:  A Contributing Cause of the Current Breast Cancer Epidemic in Nigerian Women*, BIOLOGICAL TRACE ELEMENT RESEARCH 127, 138 (Mar. 3, 2010).

This is true even at low levels of lead consumption.[11]  For example, research has shown that an increase of only 0.3 micrograms/deciliter of median blood lead levels is associated with a doubling of the risk for panic disorder.[12]  People exposed to low levels of lead lose an average of 1.37 IQ points per 1 microgram/deciliter increase in blood lead concentration.[13]  Ingested lead accumulates in the bones and brain and can cause health problems even decades later.[14]  Chronic low dose exposure to lead is believed to be associated with cognitive decline and dementia in older adults.[15]

18.  Given the potentially severe and irreversible consequences of lead consumption, Defendants' representation that the Product is made from "only the finest quality herbs and spices," and omission of the fact that it contains unsafe levels of lead is egregious.  Defendants' conduct is especially deplorable considering that only less than a year ago an infant died as a result of consuming a contaminated product manufactured under another NBTY label.[16]

19.  Plaintiff and Class Members read the Product's label, including the representation that the Product is made from "only the finest quality herbs and spices."  In reliance on this

---

[11] *Id.*

[12] Bouchard, *supra*, n.10 at 1317.

[13] Richard L. Canfield, Ph.D et al., *Intellectual Impairments in Children with Blood Lead Concentrations Below 10 Micrograms per Deciliter*, THE NEW ENGLAND JOURNAL OF MEDICINE 1517, 1521 (April 17, 2003)

[14] Marc G. Weisskopf et al., *Cumulative Lead Exposure and Prospective Change in Cognition Among Elderly Men*, 160 AMERICAN JOURNAL OF EPIDEMIOLOGY 1184, 1185, 1188, 1190-91 (2004); Jennifer Weuve et al., *Cumulative Exposure to Lead in Relation to Cognitive Function in Older Women*, 117 ENVIRONMENTAL HEALTH PERSPECTIVES 574, 578 (April 2009).

[15] Marc G. Weisskopf et al., *Cumulative Lead Exposure and Prospective Change in Cognition Among Elderly Men*, 160 AMERICAN JOURNAL OF EPIDEMIOLOGY 1184, 1185, 1188, 1190-91 (2004); Jennifer Weuve et al., *Cumulative Exposure to Lead in Relation to Cognitive Function in Older Women*, 117 ENVIRONMENTAL HEALTH PERSPECTIVES 574, 578 (April 2009); Bouchard, *supra* n.10, at 1318.

[16] *Fatal Gastrointestinal Mucormycosis in an Infant Following Ingestion of Contaminated Dietary Supplement – Connecticut 2014*, CENTERS FOR DISEASE CONTROL AND PREVENTION CDC HEALTH ADVISORY (Nov. 25, 2014), http://emergency.cdc.gov/HAN/han00373.asp; David Kroll, *Children's Probiotic Supplement Contaminated with Disease Causing Fungus*, FORBES (Nov. 18, 2014 at 11:24 AM), http://www.forbes.com/sites/davidkroll/2014/11/18/childrens-probiotic-supplement-contaminated-with-disease-causing-fungus/.

representation, as well as on the label's omission of the fact that the Product is contaminated with lead, Plaintiff and Class Members purchased the Product at a premium price. Had Plaintiff and Class Members known the truth about the Product, they would not have been willing to purchase it at a price premium.

**Defendants' Claims that the Product is Natural are False and Misleading**

20. In an effort to appeal to health conscious consumers interested in purchasing natural supplements that do not contain artificial or synthetic ingredients, Defendants market the Product as "natural." "The Product's labeling prominently represents that it is a "NATURAL WHOLE HERB" that provides "Natural Menopausal Relief' *See* Exs. B at 1, C. The Product's labeling further represents that "**Nature's Bounty's** Natural Whole Herb products utilize ground plant parts to provide the natural components in the amounts found in nature." Exs. B at 4, C. The same representations about the Product appear on Nature's Bounty's website. *See* Ex. C.

21. Furthermore, on Nature's Bounty's website Defendants explicitly represent that the Product "is the non-synthetic choice for menopausal support." Ex. B at 5.

22. Contrary to Defendants' representations, the Product is not "natural" or "non-synthetic." The Product contains magnesium stearate, which is a synthetic ingredient. *See* Ex. B at 2. Magnesium stearate is a white powder synthesized by the reaction of sodium stearate and magnesium sulfate. Magnesium stearate is used as a lubricant for pharmaceutical preparations and as an anti-sticking agent in medical devices. There have been reports that the consumption of magnesium stearate may pose health risks. Specifically, magnesium stearate has been shown to suppress immune cells that fight off cancer.[17]

---

[17] P.W. Tebbey & T.M. Buttke, *Molecular Basis for the Immunosuppressive Action of Stearic Acid on T Cells*, IMMUNOLOGY 379 (1990).

13

23. United States regulatory organizations have clearly delineated between natural ingredients and synthetic ingredients. The FDA, for example, has stated that its "…policy regarding the use of the term 'natural' on food labeling means that 'nothing artificial or synthetic (including color additives regardless of source) has been included in, or has been added to, a food that would not normally be expected to be in food." Ex. D.

24. The FDA has included dietary supplements within the definition of "food." For instance, the FDA explained that:

> The Dietary Supplement Health and Education Act (DSHEA) places dietary supplements in a special category under the general umbrella of "foods," not drugs, and requires that every supplement be labeled a dietary supplement . . . . Because dietary supplements are under the "umbrella" of foods, FDA's Center for Food Safety and Applied Nutrition (CFSAN) is responsible for the agency's oversight of these Products. *See* Ex. E at 2-3.

25. The Dietary Supplement Health and Education Act provides:

> Definition of Certain Foods as Dietary Supplements. Section 201 (21 U.S.C. § 321) is amended by adding at the end the following:
>
> "(ff) The term "dietary supplement" -
>
> > "(1) means a product (other than tobacco) intended to supplement the diet
> >
> > that bears or contains one or more of the following dietary ingredients:
> >
> > > (A) a vitamin;
> > >
> > > (B) a mineral;
> > >
> > > (C) an herb or other botanical;
> > >
> > > (D) an amino acid;

(E) a dietary substance for use by man to supplement the diet by

increasing the total dietary intake; or

(F) a concentrate, metabolite, constituent, extract, or combination

of any ingredient described in clause (A), (B), (C), (D), or (E).  *See*

Dietary Supplement Health and Education Act of 1994, Public

Law 103-417.

26.     In 2013, the USDA issued a Draft Guidance Decision Tree for Classification of

Materials as Synthetic or Nonsynthetic (Natural).  In accordance with this decision tree, a

substance is natural – as opposed to synthetic – if: a) it is manufactured, produced, or extracted

from a natural source (i.e. naturally occurring mineral or biological matter); b) it has not

undergone a chemical change (i.e. a process whereby a substance is transformed into one or

more other distinct substances) so that it is chemically or structurally different than how it

naturally occurs in the source material; or c) the chemical change was created by a naturally

occurring biological process such as composting, fermentation, or enzymatic digestion or by

hearing or burning biological matter.  *See* Ex. F.

27.     The term "synthetic" is also defined by federal statute as "a substance that is

formulated or manufactured by a chemical process or by a process that chemically changes a

substance extracted from naturally occurring plant, animal, or mineral sources, except that such

term shall not apply to substances created by naturally occurring biological processes." 7 U.S.C.

§ 6502 (21).

28.     Given that the FDA has a broad mandate and limited resources, the dietary

supplements industry is largely unregulated.  In the January 6, 2014 FDA letter, Assistant

Commissioner Leslie Kux writes "at present, priority food public health and safety matters are largely occupying the limited resources the FDA has to address food matters." Ex. D at 2.

29.　Furthermore, the FDA has explained that: "In that FDA has limited resources to analyze the composition of food products, including dietary supplements, it focuses these resources first on public health emergencies and products that may have caused injury or illness." Ex. E at 3**.** Thus, supplement makers like Defendants are held accountable through private class action litigation.

30.　A reasonable consumer's understanding of the term "natural" comports with that of federal regulators and common meaning. That is, the reasonable consumer understands the term "natural" to mean that none of the product's ingredients are synthetic or artificial. Consumer surveys demonstrate just that. According to Consumers Union, eighty-six percent of consumers expect a 'natural' label to mean that a product does not contain any artificial ingredients.[18]

31.　Consumers lack the meaningful ability to test or independently ascertain or verify the truthfulness of claims such as "natural," and "non-synthetic." Consumers would not know the true nature of the ingredients merely by reading the ingredients label. Discovering that the Product is unnatural and synthetic requires a scientific investigation beyond the grocery store and knowledge of chemistry beyond that of the average consumer. That is why, even though magnesium stearate is identified on the back of the Product's label in its ingredients list, the reasonable consumer would not understand - nor is she expected to understand - that magnesium stearate is a synthetic ingredient.

---

[18] Notice of the Federal Trade Commission, Comments of Consumers Union on Proposed Guides for Use of Environmental Marketing Claims, 16 C.F.R. § 260, Dec. 10, 2010, https://www.ftc.gov/sites/default/files/documents/public_comments/guides-use-environmental-marketing-claims-project-no.p954501-00289%C2%A0/00289-57072.pdf (last visited June 23, 2015).

32.     Moreover, the reasonable consumer is not expected or required to scour the ingredients list on the back of a product in order to confirm or debunk Defendants' prominent front-of-the-label claims, representations, and warranties.

33.     Supplement makers like Defendants intend and know that consumers make supplement purchasing decisions based upon representations made on the supplements' labeling. Basing supplement purchasing decisions on the representations made on the supplements' labeling is eminently reasonable given that supplements companies are prohibited from making false or misleading statements on their products.

34.     Defendants knew that they represented that the Product was "natural" and "non-synthetic." Defendants also knew this claim was false and misleading because magnesium stearate is a synthetically produced chemical.

35.     Defendants made these representations because consumers, including consumers of herbal supplements, prefer natural products, which they perceive as healthier and safer than products that contain synthetic ingredients.[19]

36.     Plaintiff and Class Members read Defendants' representations that the Product is natural and non-synthetic. In reliance on these representations, Plaintiff and Class Members purchased the Product at a premium price. Had Plaintiff and Class Members known the truth about the Product, they would not have been willing to purchase it at a price premium.

---

[19] Lauren F. Friedman, *Outside In: But It's All Natural! Do we have an Instinctive Preference for Herbal Remedies?* PSYCHOLOGY TODAY (Mar. 12, 2013), https://www.psychologytoday.com/articles/201303/outside-in-its-all-natural; *Chemical Blessings What Rousseau Got Wrong*, THE ECONOMIST, Feb. 4, 2008, available at http://www.economist.com/node/10633398.

**Defendants' Claims Regarding the Product's Quality are False and Misleading and the Product is Misbranded**

37.     In addition to Defendants' claims about the benefits and safety of consuming the Product, Defendants also represent and warrant that they comply with the United States Pharmacopeia's (hereinafter "USP") specifications for manufacturing black cohosh.  Nature's Bounty represents on its website that its "facilities have been successfully audited by the United States Pharmacopeia."  The USP is a scientific nonprofit that sets standards for the identity, strength, quality and purity of dietary supplements, medicine, and food products manufactured, distributed and consumed worldwide.  Under the Food, Drug and Cosmetic Act ("FDCA"), the USP is considered an Official Compendium on dietary supplements, medicine and food.  *See* 21 U.S.C. § 321(j).  Given the stature and integrity of the USP, Defendants' representation of USP approval serves as a representation and warranty of the Product's quality.

38.     Furthermore, 21 USC § 343(s)(2) (ii)(II)(D) provides that a dietary supplement is misbranded if it  "(i) is covered by the specifications of an official compendium; (ii) is represented as conforming to the specifications of an official compendium; and (iii) fails to so conform[.]"  Additionally, 21 USC § 343(a) provides that a food shall be deemed misbranded if "its labeling is false or misleading in any particular[.]"  21 USC § 321(n) provides that material omissions should be considered in deciding whether a product is misbranded.

39.     The quantity of triterpene glycosides, measured by the amount of 27-deoxyactein (sometimes referred to as 23-epi-26-deoxyactein) in a black cohosh supplement is used as a quality control indicator for the herb.  The USP's specifications for black cohosh require that:  1) it contain at least 0.4% triterpene glycosides calculated as 27-deoxyactein; and 2) that its label must specify the amount of triterpene glycosides calculated as 27-deoxyactein contained in each serving.  Ex. G at 20.

18

40.     The Product does not comply with the USP's specifications for black cohosh.  An independent laboratory tested the Product and found that each capsule contains only 0.23 % triterpene glycosides calculated as 27-deoxyactein.  *See* Ex. G at 5.  The Product's label also omits entirely the amount of 27-deoxyactein contained in each capsule.  *See* Exs. B, C.  Accordingly, Defendants' claim that Nature's Bounty has been successfully audited by the USP is false and misleading.

**Consumers Paid a Price Premium for the Product as a result of Defendants' Misrepresentations**

41.     As a result of the Defendants' misrepresentations about the Product, they have been able to sell it for a premium price.  For example, the Product sells for an average price of $9.59.  Other comparable black cohosh products that do not make the same misrepresentations are priced for substantially less.  For example, Swanson Black Cohosh is priced at $1.99 per bottle.  Thompson Black Cohosh is priced at $4.64 per bottle.

## JURISDICTION AND VENUE

42.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d)(2) in that the matter is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000 exclusive of interest and costs, and members of the class are citizens of a state different than Nature's Bounty, Inc. and NBTY, Inc.

43.     This Court has personal jurisdiction over the parties in this action because both Nature's Bounty and NBTY have their principal place of business in the State of New York.  Nature's Bounty is organized under the laws of the State of New York and NBTY is registered to do business in the State of New York.  Both Nature's Bounty and NBTY do a substantial amount of business in the State of New York.

44.     Venue is proper because Plaintiff and many Class Members reside in the Eastern District of New York.  Nature's Bounty and NBTY do a substantial amount of business in the Eastern District of New York.

## THE PARTIES

45.     Plaintiff Sonia Cauchi is a citizen of the State of New York.  She resides in - Bayside Queens, New York.  During the Class Period Plaintiff purchased the Product at retail stores and/or online in the Eastern District of New York.  Prior to purchasing the Product, Plaintiff read the Product's labeling and all of the aforementioned representations on Nature's Bounty's website relevant to the Product.  In reliance on these representations, Plaintiff paid a premium for the Product.  If Plaintiff had known that these representations were false, she would not have been willing to pay a premium price for the Product.

46.     Defendant Nature's Bounty, Inc. is a corporation organized and existing under the laws of the State of New York.  Its principal place of business is located in New York at 2100 Smithtown Avenue, Ronkonkoma, New York.  Nature's Bounty is the manufacturer of the Product.  Nature's Bounty created and/or authorized the false, misleading and deceptive advertisements and packaging for the Product.

47.     All of Nature's Bounty's business operations are carried out in New York, including, but not limited to, its manufacturing, packaging, warehousing, marketing, and sales operations.  Nature's Bounty markets and sells the Product to consumers throughout the country from its New York warehouses, headquarters and offices.  Nature's Bounty provides all customer support for the Product to consumers throughout the country from its New York offices.

48.     Upon information and belief, Nature's Bounty is wholly owned by Defendant NBTY, Inc.  NBTY is a corporation organized under the laws of Delaware with its principal place of business at 2100 Smith town Avenue, Ronkonkoma, New York.

## AGENCY ALLEGATIONS

49.     Plaintiff is informed and believes, and on that basis alleges, that at all times herein mentioned each of the Defendants was an agent, servant, employee, and/or joint venture of each of the remaining Defendants and was at all times acting within the course and scope of such agency, service, employment, and/or joint venture, and each Defendant has ratified, approved, and authorized the acts of each of the remaining Defendants with full knowledge of said facts.

50.     Defendants each aided and abetted, encouraged, and rendered substantial assistance to the other Defendants in making the misrepresentations, engaging in the deceptive practices, acting in bad faith, and committing all violations of law alleged herein.  In taking action, as alleged herein, to aid and abet and substantially assist the commissions of these wrongful acts, each of the Defendants acted with an awareness of his/her/its primary wrongdoing and realized that his/her/its conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing.

51.     There is a unity of interest between Defendants and each acts as the alter ego of the other.

## CLASS ALLEGATIONS

52.     Plaintiff brings this matter on behalf of herself and those similarly situated.  As detailed at length in this complaint, Defendants orchestrated deceptive marketing and labeling practices.  Defendants' customers were subjected to the same unlawful course of conduct by

Defendants.  Accordingly, this Complaint is uniquely situated for class-wide resolution, including injunctive relief.

53.     The class is defined as all consumers nationwide who purchased the Product at any time during the Class Period.

54.     New York law applies to all Plaintiff Class Members nationwide because upon information and belief the conduct at issue was carried out from New York.

55.     The Class is properly brought and should be maintained as a class action under Rule 23(a), satisfying the class action prerequisites of numerosity, commonality, typicality, and adequacy because:

56.     <u>Numerosity</u>: Class Members are so numerous that joinder of all members is impracticable.  Plaintiff believes that there are at least thousands of consumers who are Class Members described above who have been damaged by, inter alia, Defendants' deceptive and misleading practices.

57.     <u>Common Questions of Fact and Law</u>: The questions of law and fact common to the Class Members which predominate over any questions which may affect individual Class Members include, but are not limited to:

> a) Whether Defendants are responsible for the conduct alleged herein which was all the same course of conduct directed at all consumers who purchased their Products;
>
> b) Whether Defendants' misconduct set forth in this complaint demonstrates that Defendants have engaged in unfair, fraudulent, or unlawful business practices with respect to the advertising, marketing, and sale of the Product.

c)  Whether Defendants' false and misleading statements concerning the Product and their concealment of material facts regarding the Product was likely to deceive reasonable consumers.

d)  Whether Plaintiff and the Class are entitled to injunctive relief; and

e)  Whether Plaintiff and the Class are entitled to money damages under the same causes of action as the other Class Members.

58.     Typicality: Plaintiff is a member of the Class.  Plaintiff's claims are typical of the claims of each Class Member in that every member of the Class was susceptible to the same course of deceptive, misleading conduct and purchased Defendants' Product.  Plaintiff is entitled to relief under the same causes of action as the other Class Members.

59.     Adequacy: Plaintiff is an adequate Class representative because her interests do not conflict with the interests of the Class Members she seeks to represent; her claims are common to all members of the Class and she has a strong interest in vindicating her rights; she has retained counsel competent and experienced in complex class action litigation and they intend to vigorously prosecute this action.  Plaintiff has no interests which conflict with those of the Class.  The Class Members' interests will be fairly and adequately protected by Plaintiff and her counsel.  Defendants have acted in a manner generally applicable to the Class, making relief appropriate with respect to Plaintiff and the Class Members.  The prosecution of separate actions by individual Class Members would create a risk of inconsistent and varying adjudications.

60.     The Class is properly brought and should be maintained as a class action under Rule 23(b) because a class action is superior.  Pursuant to Rule 23(b)(3), common issues of law and fact predominate over any other questions affecting only individual members of the class. The Class issues fully predominate over any individual issue because no inquiry into individual

conduct is necessary, just a narrow focus on Defendants' deceptive and misleading Product marketing and labeling practices. In addition, this class is superior to other methods for fair and efficient adjudication of this controversy because, *inter alia*:

61. <u>Superiority</u>: A class action is superior to the other available methods for the fair and efficient adjudication of this controversy because:

    a) The joinder of thousands of individual Class Members is impracticable, cumbersome, unduly burdensome, and a waste of judicial and/or litigation resources;

    b) The individual claims of the Class Members may be relatively modest compared with the expense of litigating the claim, thereby making it impracticable, unduly burdensome, expensive, if not totally impossible, to justify individual actions;

    c) When Defendants' liability has been adjudicated, all Class Members' claims can be determined by the Court and administered efficiently in a manner far less burdensome and expensive than if it were attempted through filing, discovery, and trial of all individual cases;

    d) This class action will promote orderly, efficient, expeditious, and appropriate adjudication and administration of class claims;

    e) Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action;

    f) This class action will assure uniformity of decisions among Class Members; and

g) The Class is readily definable and prosecution of this action as a class action will eliminate the possibility of repetitious litigation.

**FIRST CAUSE OF ACTION**
**VIOLATION OF NEW YORK GBL § 349**
**(On Behalf of Plaintiff and All Class Members)**

62. Plaintiff repeats and realleges each and every allegation contained in all the foregoing paragraphs as if fully set forth herein. New York General Business Law Section 349 ("GBL § 349") declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state . . ."

63. GBL § 349(h) directs that "any person who has been injured by reason of any violation of [GBL § 349] may bring an action in his own name to enjoin such unlawful act or practice . . ."

64. The conduct of Defendants alleged herein constitutes recurring, "unlawful" deceptive acts and practices in violation of GBL § 349, and as such, Plaintiff and Class Members seek monetary damages and the entry of preliminary and permanent injunctive relief against Defendants, enjoining them from inaccurately describing, labeling, marketing, and promoting the Product.

65. There is no adequate remedy at law.

66. Defendants misleadingly, inaccurately and deceptively represent the Product.

67. Defendants misleadingly, inaccurately and deceptively misrepresented to Plaintiff and Class Members that the Product "Helps [to] Alleviate Hot Flashes, Night Sweats and Mild Mood Changes" and that "Studies document Black Cohosh's ability to help support the physical changes that occur in a woman's body over time."

25

68.     Defendants misleadingly, inaccurately and deceptively misrepresented to Plaintiff and Class Members that the Product is made "us[ing] only the finest quality herbs and spices" and omitted that the Product is contaminated with unsafe levels of lead.

69.     Defendants misleadingly, inaccurately and deceptively misrepresented to Plaintiff and Class Members that the Product is a "NATURAL WHOLE HERB" that provides "Natural Menopausal Relief" and that "**Nature's Bounty's** Natural Whole Herb products utilize ground plant parts to provide the natural components in the amounts found in nature" and that the Product "is the non-synthetic choice for menopausal support."

70.     Defendants misleadingly, inaccurately and deceptively misrepresented to Plaintiff and Class Members that Nature's Bounty's facilities have been successfully audited by the USP.

71.     Contrary to Defendants' representations, the Product cannot provide any of the represented benefits. Every reliable, scientifically sound study on black cohosh has demonstrated that it is no better than a placebo at alleviating hot flashes, night sweats, mild mood changes, or any other symptoms of menopause. No reliable, scientifically sound studies have demonstrated any of the benefits of black cohosh consumption represented by Defendants. All reasonable experts in the field would agree that Defendants' representations regarding the benefits of consuming black cohosh and/or the Product are false and/or misleading.

72.     Contrary to Defendants' representations, all studies that claim to document any benefit to black cohosh consumption tested black cohosh formulations that were substantially different than the Product's formulation. Accordingly, all reasonable experts in the field would agree that these studies are not relevant to the Product.

73.     Contrary to Defendants' representations, the Product is not made "us[ing] only the finest quality herbs and spices." Rather, the Product is contaminated with unsafe levels of lead.

26

74. Contrary to Defendants' representations, the Product is not "natural" or "non-synthetic" because it contains magnesium stearate, a synthetic ingredient.

75. Contrary to Defendants' representations, the Product does not comply with the specifications of the USP because it does not contain a sufficient amount of 27-deoxyactein and its label does not specify the amount of 27-deoxyactein contained in each dose.

76. These misrepresentations were material to Plaintiff and Class Members. The reasonable consumer would expect the Product to provide the benefits and meet the quality standards represented on the Product's label and on Defendants' website.

77. Defendants made their untrue and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

78. Plaintiff and the Class Members have been injured inasmuch as they paid a premium for the Product.

79. Accordingly, Plaintiff and Class Members received less than what they bargained and paid for.

80. Defendants' advertising and Product labeling induced the Plaintiff and Class Members to pay a premium for the Product.

81. Defendants' deceptive and misleading practices constitute deceptive acts and practices in the conduct of its business in violation of New York General Business Law § 349(a) and Plaintiff and Class Members have been damaged thereby.

82. As a result of Defendants' recurring, "unlawful" deceptive acts and practices, Plaintiff and Class Members are entitled to monetary, compensatory, treble and punitive damages, injunctive relief, restitution and disgorgement of all moneys obtained by means of Defendants' unlawful conduct, interest, and attorneys' fees and costs.

## SECOND CAUSE OF ACTION
## VIOLATION OF NEW YORK GBL § 350
### (On Behalf of Plaintiff and Class Members)

83.     Plaintiff repeats and realleges each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

84.     N.Y. Gen. Bus. Law § 350 provides, in part, as follows:

> False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful.

85.     N.Y. Gen. Bus. Law § 350-a(1) provides, in part, as follows:

> The term 'false advertising' means advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect.  In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity or employment to which the advertising relates under the conditions proscribed in said advertisement, or under such conditions as are customary or usual . . . .

86.     Defendants' labeling and advertisements contain untrue and materially misleading statements concerning Defendants' Product inasmuch as they represent to Plaintiff and Class Members that the Product "Helps [to] Alleviate Hot Flashes, Night Sweats and Mild Mood Changes" and that "Studies document Black Cohosh's ability to help support the physical changes that occur in a woman's body over time."

28

87.     Defendants' labeling and advertisements materially and misleadingly state that the Product is made "us[ing] only the finest quality herbs and spices" and omits that the Product is contaminated with unsafe levels of lead.

88.     Defendants' labeling and advertisements materially and misleading state that the Product is a "NATURAL WHOLE HERB" that provides "Natural Menopausal Relief," that "**Nature's Bounty's** Natural Whole Herb products utilize ground plant parts to provide the natural components in the amounts found in nature" and that the Product "is the non-synthetic choice for menopausal support."

89.     Defendants' advertisements materially and misleadingly state that Nature's Bounty's facilities have been successfully audited by the USP.

90.     Plaintiff and Class Members have been injured inasmuch as they relied upon the Product's labeling and advertising and paid a premium for the Product which does not provide any of the advertised benefits.  All reliable studies demonstrate that Black cohosh cannot help to alleviate hot flashes, night sweats, mild mood changes, or any other symptoms of menopause.  Furthermore, all of the studies that claim to document any benefit to black cohosh consumption tested black cohosh formulations that were substantially different than the Product's formulation and are not relevant to the Product.

91.     The Product is not made "us[ing] only the finest quality herbs and spices" and is contaminated with unsafe levels of lead.  The Product is also not "natural" or "non-synthetic" given that it contains magnesium stearate, which is synthetic.  The Product does not comply with the specifications of the USP because it does not contain a sufficient amount of 27-deoxyactein and its label does not specify the amount of 27-deoxyactein contained in each dose.

29

92.     Defendants made their untrue and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

93.     Defendants' advertising and Product labeling induced the Plaintiff and Class Members to pay a premium for the Product.

94.     Defendants' untrue and misleading statements about the Product were material to Plaintiff and Class Members.  The reasonable consumer would expect the Product to provide the benefits and meet the quality standards represented on the Product's label and on Defendants' website.

95.     Defendants' conduct constitutes multiple, separate violations of N.Y. Gen. Bus. Law § 350.

96.     Defendants made the material misrepresentations described in this Complaint in their advertising and on the Product's labeling.

97.     Defendants' material misrepresentations were substantially uniform in content, presentation, and impact upon consumers at large.  Moreover, all consumers purchasing the Product were and continue to be exposed to Defendants' material misrepresentations.

98.     As a result of Defendants' false and misleading labeling and advertising, Plaintiff and Class Members are entitled to monetary, compensatory, treble and punitive damages, injunctive relief, restitution and disgorgement of all monies obtained by means of Defendants' unlawful conduct, interest, and attorneys' fees and costs.

### THIRD CAUSE OF ACTION
### VIOLATION OF NEW YORK GBL § 350-a(1)
**(On Behalf of Plaintiff and All New York Subclass Members)**

99.     Plaintiff repeats and realleges each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

100.  N.Y. Gen. Bus. Law § 350-a(1) expressly covers material omissions:

In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material and in light of such representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity or employment to which the advertising relates under the conditions proscribed in said advertisement, or under such conditions as are customary or usual . . .

101.  Defendants' Product labeling and/or advertising contains misleading and/or unfair material omissions concerning Defendants' Product, including that all reliable studies demonstrate that black cohosh does not help to alleviate hot flashes, night sweats, mild mood changes or any other symptoms of menopause.

102.  The Product's labeling and/or advertising omits that all of the studies that claim to document any benefit to black cohosh consumption tested black cohosh formulations that were substantially different than the Product's formulation and are not relevant to the Product.

103.   The Product's labeling and/or advertising omits that the Product is contaminated with unsafe levels of lead and that the Product is synthetic.  The Product's labeling and advertisements also omit that it does not contain a sufficient amount of 27-deoxyactein to comply with the specifications of the USP, and that its label does not disclose all of the information required by the USP.

31

104.    Plaintiff and Class Members have been injured inasmuch as they relied upon the labeling and advertising and paid a premium for the Product which does not provide any of the advertised benefits.   The Product cannot help to alleviate hot flashes, night sweats, mild mood changes, or any other symptoms of menopause, and any suggestion of same is misleading  The Product is not made "us[ing] only the finest quality herbs and spices" and is contaminated with unsafe levels of lead.  The Product is also not "natural" or "non-synthetic" given that it contains magnesium stearate, which is synthetic.  The Product does not comply with the specifications of the USP because it does not contain a sufficient amount of 27-deoxyactein and its label does not specify the amount of 27-deoxyactein contained in each dose.

105.    Defendants made their untrue and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

106.    Defendants' conduct of omitting material facts in the Product's advertising and labeling constitutes multiple, separate violations of N.Y. Gen. Bus. Law. § 350.

107.    Defendants' material misrepresentations by way of omissions, as described in this Complaint, were substantially uniform in content, presentation, and impact upon consumers at large.  Moreover, all consumers purchasing the Product were and continue to be exposed to Defendants' material misrepresentations by way of omissions.

108.    Defendants' advertising and Product labeling induced the Plaintiff and Class Members to pay a premium for the Product.

109.    Plaintiff and Class Members relied on Defendants' advertising, which was deceptive, false and contained material omissions.

110.    As a result of Defendants' false or misleading advertising and labeling, the Plaintiff and Class Members are entitled to monetary, compensatory, treble and punitive

damages, injunctive relief, restitution and disgorgement of all monies obtained by means of Defendants' unlawful conduct, interest, and attorneys' fees and costs.

<u>**FOURTH CAUSE OF ACTION**</u>
<u>**VIOLATION OF STATE CONSUMER PROTECTION STATUTES**</u>
**(On Behalf of Plaintiff and All Class Members)**

111.    Plaintiff repeats and realleges each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

112.    Plaintiff and Class Members have been injured as a result of Defendants' violations of the following state consumer protection statutes, which also provide a basis for redress to Plaintiff and Class Members based on Defendants' fraudulent, deceptive, unfair and unconscionable acts, practices and conduct.

113.    Defendants' conduct as alleged herein violates the consumer protection, unfair trade practices and deceptive acts laws of each of the following jurisdictions:

a.    **Alaska:** Defendant's practices were and are in violation of Alaska's Unfair Trade Practices and Consumer Protection Act, Alaska Stat. § 45.50.471, *et seq.*

b.    **Arizona:**  Defendant's practices were and are in violation of Arizona's Consumer Fraud Act, Ariz. Rev. Stat. Ann. §§ 44-1521, *et seq*.

c.    **Arkansas:**  Defendant's practices were and are in violation of Arkansas Code Ann. § 4-88-101, *et seq.*

d.    **California:**  Defendant's practices were and are in violation of California Consumer Legal Remedies Act, Civil Code § 1750, *et seq.*, and California's Unfair Competition Law, California Business and Professions Code § 17200, *et seq.*

33

e.   **Colorado**:  Defendant's practices were and are in violation of Colorado's Consumer Protection Act, Colo. Rev. Stat. §§ 61-1-101, *et seq.*

f.   **Connecticut:**  Defendant's practices were and are in violation of Connecticut's Gen. Stat. § 42-110a, *et seq.*

g.   **Delaware:**  Defendant's practices were and are in violation of Delaware's Consumer Fraud Act, Del. Code Ann. tit. 6, § 2511, *et seq.* and the Deceptive Trade Practices Act, Del. Code Ann. tit. 6, § 2531, *et seq.*

h.   **District of Columbia:**  Defendant's practices were and are in violation of the District of Columbia's Consumer Protection Act, D.C. Code § 28-3901, *et seq.*

i.   **Florida:**  Defendant's practices were and are in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § 501.201, *et seq.*

j.   **Hawaii:**  Defendant's practices were and are in violation of the Hawaii's Uniform Deceptive Trade Practices Act, Haw. Rev. Stat. § 481A-1, *et seq.* and Haw. Rev. Stat. § 480-2.

k.   **Idaho:**  Defendant's practices were and are in violation of Idaho's Consumer Protection Act, Idaho Code Ann. § 48-601, *et seq.*

l.   **Illinois:**  Defendant's acts and practices were and are in violation of Illinois' Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/2; and Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. 510/2.

m.   **Indiana:**  Defendant's practices were and are in violation of Indiana's Deceptive Consumer Sales Act, Ind. Code Ann. § 24-5-0.5-1, *et seq.*

n.   **Kansas:**  Defendant's practices were and are in violation of Kansas's Consumer Protection Act, Kat. Stat. Ann. § 50-623, *et seq.*

34

o. **Kentucky:** Defendant's practices were and are in violation of Kentucky's Consumer Protection Act, Ky. Rev. Stat. Ann. § 367.110, *et seq.*

p. **Maine:** Defendant's practices were and are in violation of the Maine Unfair Trade Practices Act, 5 Me. Rev. Stat. Ann. Tit. 5, § 205-A, *et seq.* and 10 Me. Rev. Stat. Ann. § 1101, *et seq.*

q. **Maryland:** Defendant's practices were and are in violation of Maryland's Consumer Protection Act, Md. Code Ann. Com. Law § 13-101, *et seq.*

r. **Massachusetts:** Defendant's practices were unfair and deceptive acts and practices in violation of Massachusetts' Consumer Protection Act, Mass. Gen. Laws ch. 93A, § 2.

s. **Michigan:** Defendant's practices were and are in violation of Michigan's Consumer Protection Act, Mich. Comp. Laws Ann. § 445.901, *et seq.*

t. **Minnesota:** Defendant's practices were and are in violation of Minnesota's Prevention of Consumer Fraud Act, Minn. Stat. § 325F.68, *et seq.* and the Unlawful Trade Practices law, Minn. Stat. § 325D.09, *et seq.*

u. **Missouri:** Defendant's practices were and are in violation of Missouri's Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq.*

*v.* **Nebraska:** Defendant's practices were and are in violation of Nebraska's Consumer Protection Act, Neb. Rev. Stat. § 59-1601, *et seq.* and the Uniform Deceptive TradePractices Act, § 87-302, *et seq.*

w. **Nevada:** Defendant's practices were and are in violation of Nevada's Deceptive Trade Practices Act, Nev. Rev. Stat. Ann. §§ 598.0903 and 41.600.

35

x.   **New Hampshire:**  Defendant's practices were and are in violation of New Hampshire's Regulation of Business Practices for Consumer Protection, N.H. Rev. Stat. Ann. § 358-A:1, *et seq.*

y.   **New Jersey:**  Defendant's practices were and are in violation of New Jersey's Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1, *et seq.*

z.   **New Mexico:**  Defendant's practices were and are in violation of New Mexico's Unfair Practices Act, N.M. Stat. Ann. § 57-12-1, *et seq.*

aa.   **New York:**  Defendant's practices were in and are in violation of New York's Gen. Bus. Law §§ 349, *et seq.*

bb.   **North Carolina:**  Defendant's practices were and are in violation of North Carolina's Unfair Deceptive Trade Practices Act, N.C. Gen. Stat. Ann. § 75-1, *et seq.*

cc.   **North Dakota:**  Defendant's practices were and are in violation of North Dakota's Unlawful Sales or Advertising Practices law, N.D. Cent. Code § 51-15-01, *et seq.*

dd.   **Ohio:**  Defendant's practices were and are in violation of Ohio's Consumer Sales Practices Act, Ohio Rev. Code Ann. § 1345.01, *et seq.* and Ohio's Deceptive Trade Practices Act. Ohio Rev. Code Ann. § 4165.01, *et seq.*

ee.   **Oklahoma:**  Defendant's practices were and are in violation of Oklahoma's Consumer Protection Act, Okla. Stat. Ann. tit. 15 § 751, *et seq.*, and Oklahoma's Deceptive Trade Practices Act, Okla. Stat. Ann. tit. 78 § 51, *et seq.*

ff.   **Oregon:**  Defendant's practices were and are in violation of Oregon's Unlawful Trade Practices law, Or. Rev. Stat. § 646.605, *et seq.*

gg. **Pennsylvania:** Defendant's practices were and are in violation of Pennsylvania's Unfair Trade Practice and Consumer Protection Law, 73 Pa. Stat. Ann. § 201-1, *et seq.*

hh. **Rhode Island:** Defendant's practices were and are in violation of Rhode Island's Deceptive Trade Practices Act, R.I. Gen. Laws § 6-13.1-1, *et seq.*

ii. **South Dakota:** Defendant's practices were and are in violation of South Dakota's Deceptive Trade Practices and Consumer Protection Act, S.D. Codified Laws § 37-24-1, *et seq.*

jj. **Texas:** Defendant's practices were and are in violation of Texas' Deceptive Trade Practices Consumer Protection Act, Tex. Bus. & Com. Code Ann. § 17.41, *et seq.*

kk. **Utah:** Defendant's practices were and are in violation of Utah's Consumer Sales Practices Act, Utah Code Ann. § 13-11-1, *et seq.*, and Utah's Truth in Advertising Law, Utah Code Ann. § 13-11a-1, *et seq.*

ll. **Vermont:** Defendant's practices were and are in violation of Vermont's Consumer Fraud Act, Vt. Stat. Ann. tit. 9 § 2451, *et seq.*

mm. **Washington:** Defendant's practices were and are in violation of Washington Consumer Protection Act, Wash. Rev. Code Ann. § 19.86, *et seq.*

nn. **West Virginia:** Defendant's practices were and are in violation of West Virginia's Consumer Credit and Protection Act, W. Va. Code § 46A-6-101, *et seq.*

*oo.* **Wisconsin:** Defendant's practices were and are in violation of Wisconsin's Consumer Act, Wis. Stat. §421.101, *et seq.*

pp. **Wyoming:** Defendant's practices were and are in violation of Wyoming's Consumer Protection Act, Wyo. Stat. Ann. §40-12-101, *et seq*.

114.    Defendants violated the aforementioned states' unfair and deceptive acts and practices laws by representing that the Product "Helps [to] Alleviate Hot Flashes, Night Sweats and Mild Mood Changes" and that "Studies document Black Cohosh's ability to help support the physical changes that occur in a woman's body over time."  Defendants further represented that the Product is made "us[ing] only the finest quality herbs and spices" while omitting that it is contaminated with unsafe levels of lead.  Defendants also represented that the Product is a "NATURAL WHOLE HERB" that provides "Natural Menopausal Relief," "utilize[s] ground plant parts to provide the natural components in the amounts found in nature" and that the Product "is the non-synthetic choice for menopausal support."  Additionally, Defendants represented that Nature's Bounty's facilities have been successfully audited by the USP.

115.    Contrary to Defendants' representations, it mislead consumers to believe that black cohosh can alleviate hot flashes, night sweats, mild mood changes, and other symptoms of menopause.   However, all the studies that claim to document any benefit to black cohosh consumption tested black cohosh formulations that are substantially different than the Product's formulation and are not relevant to the Product.

116.    Contrary to Defendants' representations, the Product is not made "us[ing] only the finest quality herbs and spices."  The Product is contaminated with unsafe levels of lead.

117.    Contrary to Defendants' representations, the Product is not "natural" or "non-synthetic" because it contains magnesium stearate, a synthetic ingredient.

118.     Contrary to Defendants' representations, the Product does not comply with the specifications of the USP because it does not contain a sufficient amount of 27-deoxyactein and its label does not specify the amount of 27-deoxyactein contained in each dose.

119.     These misrepresentations were material to Plaintiff's and Class Members' decision to pay a premium for the Product.  The reasonable consumer would expect the Product to provide the benefits and meet the quality standards represented on the Product's label and on Defendants' website.

120.     Defendants made their untrue and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

121.     As a result of Defendants' violations of the aforementioned states' unfair and deceptive practices laws, Plaintiff and Class Members paid a premium for the Product.

122.     As a result of Defendants' violations, Defendants have been unjustly enriched.

123.     Pursuant to the aforementioned states' unfair and deceptive practices laws, Plaintiff and Class Members are entitled to recover compensatory damages, restitution, punitive and special damages including but not limited to treble damages, reasonable attorneys' fees and costs and other injunctive or declaratory relief as deemed appropriate or permitted pursuant to the relevant law.

## FIFTH CAUSE OF ACTION
### COMMON LAW FRAUD
### (On Behalf of Plaintiff and All Class Members)

124.     Plaintiff repeats and realleges each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

125.     Defendants represented in the Product's labeling and in its advertisements that it "Helps [to] Alleviate Hot Flashes, Night Sweats and Mild Mood Changes" and that "Studies

39

document Black Cohosh's ability to help support the physical changes that occur in a woman's body over time." Defendants further represented that the Product is made "us[ing] only the finest quality herbs and spices" while omitting that it is contaminated with unsafe levels of lead. Defendants also represented that the Product is a "NATURAL WHOLE HERB" that provides "Natural Menopausal Relief," that "utilize[s] ground plant parts to provide the natural components in the amounts found in nature" and that the Product "is the non-synthetic choice for menopausal support." Additionally, Defendants represented that Nature's Bounty's facilities have been successfully audited by the USP.

126.    Contrary to Defendants' representations, black cohosh cannot alleviate hot flashes, night sweats, mild mood changes, or any other symptoms of menopause as is demonstrated by all the reliable studies on black cohosh. Furthermore, all the studies that claim to document any benefit to black cohosh consumption tested black cohosh formulations that were substantially different than the Product's formulation and are not relevant to the Product. Furthermore, in making the Product Defendants did not "use only the finest quality herbs and spices." Rather, the Product is contaminated with unsafe levels of lead. Nor is the Product "natural" or "non-synthetic." Rather, it contains magnesium stearate, a synthetic ingredient that may suppress the body's immune response to cancer. The Product also fails to comply with the specifications of the USP because it does not contain a sufficient amount of 27-deoxyactein and its label does not specify the amount of 27-deoxyactein contained in each dose.

127.    These representations are material because they concern the Product's quality, safety, and benefits.

128.    Defendants made each of these representations about the Product with knowledge of its falsity or with reckless and wanton disregard for the truth.

40

129.     Defendants made the aforementioned misrepresentations with the intention of inducing consumers to buy the Product.  Defendants were aware that the Product could not provide any of the represented benefits.  Defendants made these representations anyway because they believed that consumers would rely on them for information about the Product because consumers would not have the training or expertise necessary to evaluate Defendants' claims. Defendants marketed the Product as "natural" and "non-synthetic" even though they knew these representations were false.  Defendants knew that consumers prefer "natural" products because they perceive them to be healthier and safer.  Defendants knew that reasonable consumers would not have the training or expertise to identify synthetic ingredients on the Product's label. Defendants also knew or acted with reckless disregard for the fact that the Product was contaminated with lead.  Defendants knew that consumers would not have the training or access to laboratory equipment necessary to discover that the Product contained lead.  Defendants omitted information regarding the Product's lead contamination because Defendants knew disclosing that information would deter consumers from purchasing the product.  Finally, Defendants represented on Nature's Bounty's website that they have been successfully audited by the USP even though Defendants knew this was false.  Defendants believed that consumers would be more likely to buy the Product if they believed that a third party had ensured its quality and safety.  Defendants knew that consumers would have no way of knowing that this representation was false.

130.     Plaintiff and Class Members purchased the Product based on their reliance on the representations made on the Product's labeling and in the Product's advertisements.  Plaintiff and Class Members believed, based on their review of the Product's labeling that it was a natural whole herb that provided natural menopausal relief for hot flashes, night sweats, mood changes

41

and symptoms of menopause. Plaintiff and Class Members believed, based on their review of the Product's labeling and advertisements, that relevant, reliable studies proved these claims. Plaintiff and Class Member also believed, based on these representations, that the Product was made from the finest ingredients, was not contaminated with any harmful substances, and met the standards established by the USP.

131.    As a result of Plaintiff's and Class Members' reliance on Defendants' misrepresentations, Plaintiff and Class Members purchased the Product, which could not provide any of the represented benefits, that was contaminated with lead, that contained a synthetic ingredient magnesium stearate which may suppress the body's immune response to cancer and that did not meet the quality standards or specifications established by the USP.

132.    Plaintiff and Class Members seek actual damages caused by Defendants' fraud, punitive damages, interest, costs and attorneys' fees in an amount to be determined at trial and an order compelling Defendants to cease their practice of making misrepresentations about the Product.

**SIXTH CAUSE OF ACTION**
**BREACH OF EXPRESS WARRANTY**
**(On Behalf of Plaintiff and All Class Members)**

133.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

134.    Defendants provided the Plaintiff and Class Members with an express warranty in the form of written affirmations of fact promising and representing that the Product "Helps [to] Alleviate Hot Flashes, Night Sweats and Mild Mood Changes" and that "Studies document Black Cohosh's ability to help support the physical changes that occur in a woman's body over time."  Defendants expressly warranted that the Product is made "us[ing] only the finest quality

42

herbs and spices" while omitting that the Product is contaminated with unsafe levels of lead. Defendants expressly warranted that the Product is a "NATURAL WHOLE HERB," provides "Natural Menopausal Relief," and "utilize[s] ground plant parts to provide the natural components in the amounts found in nature" and "is the non-synthetic choice for menopausal support." Defendants expressly warranted that Nature's Bounty's facilities have been successfully audited by the USP.

135.    The above affirmations of fact were not couched as "belief" or "opinion," and were not "generalized statements of quality not capable of proof or disproof."

136.    These affirmations of fact became part of the basis for the bargain and were material to the Plaintiff's and Class Members' transactions.

137.    Plaintiff and Class Members reasonably relied upon the Defendants' affirmations of fact and justifiably acted in ignorance of the material facts omitted or concealed when they decided to buy Defendants' Products.

138.    Within a reasonable time after they knew or should have known of Defendants' breach, Plaintiff, on behalf of herself and Class Members, placed Defendants on notice of their breach, giving Defendants an opportunity to cure their breach, which they refused to do.

139.    Defendants breached the express warranty because the black cohosh cannot alleviate hot flashes, night sweats, mild mood changes, or any other symptoms of menopause. No reliable, scientifically sound studies have demonstrated any of the benefits of black cohosh consumption represented by Defendants. Furthermore, all the studies that claim to document any benefit to black cohosh consumption tested black cohosh formulations that were substantially different than the Product's formulation and are not relevant to the Product. The Product is not made "us[ing] only the finest quality herbs and spices" and is contaminated with unsafe levels of

lead. The Product is not "natural" or "non-synthetic" because it contains magnesium stearate, a synthetic ingredient that may suppress the body's immune response to cancer. The Product does not comply with the specifications of the USP because it does not contain a sufficient amount of 27-deoxyactein and its label does not specify the amount of 27-deoxyactein contained in each dose.

140.    Defendants thereby breached the following state warranty laws:

a.    Code of Ala. § 7-2-313;

b.    Alaska Stat. § 45.02.313;

c.    A.R.S. § 47-2313;

d.    A.C.A. § 4-2-313;

e.    Cal. Comm. Code § 2313;

f.    Colo. Rev. Stat. § 4-2-313;

g.    Conn. Gen. Stat. § 42a-2-313;

h.    6 Del. C. § 2-313;

i.    D.C. Code § 28:2-313;

j.    Fla. Stat. § 672.313;

k.    O.C.G.A. § 11-2-313;

l.    H.R.S. § 490:2-313;

m.    Idaho Code § 28-2-313;

n.    810 I.L.C.S. 5/2-313;

o.    Ind. Code § 26-1-2-313;

p.    Iowa Code § 554.2313;

q.    K.S.A. § 84-2-313;

r.    K.R.S. § 355.2-313;

s.    11 M.R.S. § 2-313;

t.    Md. Commercial Law Code Ann. § 2-313;

u.    106 Mass. Gen. Laws Ann. § 2-313;

v.    M.C.L.S. § 440.2313;

w.    Minn. Stat. § 336.2-313;

x.    Miss. Code Ann. § 75-2-313;

y.    R.S. Mo. § 400.2-313;

z.    Mont. Code Anno. § 30-2-313;

aa.    Neb. Rev. Stat. § 2-313;

bb.    Nev. Rev. Stat. Ann. § 104.2313;

cc.    R.S.A. 382-A:2-313;

dd.    N.J. Stat. Ann. § 12A:2-313;

ee.    N.M. Stat. Ann. § 55-2-313;

ff.    N.Y. U.C.C. Law § 2-313;

gg.    N.C. Gen. Stat. § 25-2-313;

hh.    N.D. Cent. Code § 41-02-30;

ii.    II. O.R.C. Ann. § 1302.26;

jj.    12A Okl. St. § 2-313;

kk.    Or. Rev. Stat. § 72-3130;

ll.    13 Pa. Rev. Stat. § 72-3130;

mm.    R.I. Gen. Laws § 6A-2-313;

nn.    S.C. Code Ann. § 36-2-313;

oo.    S.D. Codified Laws, § 57A-2-313;

pp.    Tenn. Code Ann. § 47-2-313;

qq.    Tex. Bus. & Com. Code § 2.313;

rr.    Utah Code Ann. § 70A-2-313;

ss.    9A V.S.A. § 2-313;

tt.    Va. Code Ann. § 59.1-504.2;

uu.    Wash. Rev. Code Ann. § 6A.2-313;

vv.    W. Va. Code § 46-2-313;

ww.    Wis. Stat. § 402.313;

xx.    Wyo. Stat. § 34.1-2-313.

141.    As a direct and proximate result of Defendants' breach of express warranty, Plaintiff and Class Members were damaged in the amount of the price they paid for the Product, in an amount to be proven at trial.

**SEVENTH CAUSE OF ACTION**
**VIOLATION OF THE MAGNUSSON-MOSS**
**WARRANTY ACT, 15 U.S.C. § 2301 et seq.**
**(On Behalf of Plaintiff and All Class Members)**

142.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

143.    Plaintiff brings this claim individually and on behalf of all members of the Class. Upon certification, the Class will consist of more than 100 named Plaintiffs.

144.    The Magnusson-Moss Warranty Act provides a federal remedy for consumers who have been damaged by the failure of a supplier or warrantor to comply with any obligation under a written warranty or implied warranty, or other various obligations established under the Magnusson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.*

145.    The Product is a "consumer Product" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

146.    Plaintiff and other members of the Class are "consumers" within the meaning of the Magnusson-Moss Warranty Act, 15 U.S.C. § 2301(3).

147.    Each Defendant is a "supplier" and "warrantor" within the meaning of the Magnusson-Moss Warranty Act, 15 U.S.C. §§ 2301(4) & 2301(5).

148.    Defendants represented in writing that the Product "Helps [to] Alleviate Hot Flashes, Night Sweats and Mild Mood Changes" and that "Studies document Black Cohosh's ability to help support the physical changes that occur in a woman's body over time." Defendants represented in writing that the Product is made "us[ing] only the finest quality herbs and spices" while omitting that the Product is contaminated with unsafe levels of lead. Defendants represented in writing that the Product is a "NATURAL WHOLE HERB," provides "Natural Menopausal Relief," "utilize[s] ground plant parts to provide the natural components in the amounts found in nature" and "is the non-synthetic choice for menopausal support." Defendants represented in writing that Nature's Bounty's facilities have been successfully audited by the USP.

149.    These statements were made in connection with the sale of the Product and relate to the nature of the Product and affirm and promise that the Product is as represented and defect free and, as such, are "written warranties" within the meaning of the Magnusson-Moss Warranty Act, 15 U.S.C. § 2301(6)(A).

150.    As alleged herein, Defendants have breached the written warranty by selling consumers a product in a manner that misleads them to believe it can alleviate hot flashes, night sweats, mild mood changes, or any other symptoms of menopause.  No reliable, scientifically

47

sound studies have demonstrated any of the benefits of black cohosh consumption represented by Defendants, and any such statement to the contrary is misleading. Furthermore, all the studies that claim to document any benefit to black cohosh consumption tested black cohosh formulations that were substantially different than the Product's formulation and are not relevant to the Product. The Product is not made "us[ing] only the finest quality herbs and spices" and is contaminated with unsafe levels of lead. The Product is not "natural" or "non-synthetic" because it contains magnesium stearate, a synthetic ingredient. The Product does not comply with the specifications of the USP because it does not contain a sufficient amount of 27-deoxyactein and its label does not specify the amount of 27-deoxyactein contained in each dose.

151. The Product does not conform to the Defendants' written warranty and therefore violates the Magnusson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq*. Consequently, Plaintiff and the other members of the Class have suffered injury and are entitled to damages in an amount to be proven at trial.

**EIGHTH CLAIM FOR RELIEF**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(On Behalf of Plaintiff and All Class Members)**

152. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

153. Defendants are in the business of manufacturing, producing, distributing, and selling black cohosh and other dietary and herbal supplements.

154. Under the Uniform Commercial Code's implied warranty of merchantability, the Defendants warranted to the Plaintiff and Class Members that the Product "Helps [to] Alleviate Hot Flashes, Night Sweats and Mild Mood Changes" and that "Studies document Black Cohosh's ability to help support the physical changes that occur in a woman's body over time."

48

Defendants warranted that the Product is made "us[ing] only the finest quality herbs and spices" while omitting that the Product is contaminated with unsafe levels of lead. Defendants warranted that the Product is a "NATURAL WHOLE HERB," provides "Natural Menopausal Relief," "utilize[s] ground plant parts to provide the natural components in the amounts found in nature" and "is the non-synthetic choice for menopausal support." Defendants represented in writing that Nature's Bounty's facilities have been successfully audited by the USP.

155. Defendants breached the implied warranty of merchantability by selling consumers a product that cannot alleviate hot flashes, night sweats, mild mood changes, or any other symptoms of menopause. No reliable, scientifically sound studies have demonstrated any of the benefits of black cohosh consumption represented by Defendants. Furthermore, all the studies that claim to document any benefit to black cohosh consumption tested black cohosh formulations that were substantially different than the Product's formulation and are not relevant to the Product. The Product is not made "us[ing] only the finest quality herbs and spices" and is contaminated with unsafe levels of lead. The Product is not "natural" or "non-synthetic" because it contains magnesium stearate, a synthetic ingredient. The Product does not comply with the specifications of the USP because it does not contain a sufficient amount of 27-deoxyactein and its label does not specify the amount of 27-deoxyactein contained in each dose.

156. Within a reasonable time after the Plaintiff discovered that the Product did not comply with Defendants' representations Plaintiff notified Defendants of such breach.

157. The inability of the Product to conform with Defendants' representations was wholly due to Defendants' fault and without Plaintiff's or Class Members' fault or neglect, and was solely due to the Defendants' manufacture and distribution of the Products to the public.

158.     As a result of the foregoing, Plaintiff and Class Members have been damaged in the amount paid for the Defendants' Products, together with interest thereon from the date of purchase.

### NINTH CLAIM FOR RELIEF
### BREACH OF IMPLIED WARRANTY
### OF FITNESS FOR A PARTICULAR PURPOSE
#### (On Behalf of Plaintiff and All Class Members)

159.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

160.     Plaintiff and Class Members bought the Product with the specific purpose of buying a natural, non-synthetic black cohosh product that would help to alleviate hot flashes, night sweats and mild mood changes as demonstrated by reliable, relevant studies, that was made using the finest quality herbs and spices and that was not contaminated with lead, and that complied with the specifications of the USP.

161.     Plaintiff and other Class Members, intending to buy such a supplement, relied on Defendants to select the Product to fit their specific intended use.

162.     Defendants held themselves out as having particular knowledge of the Product's benefits and quality.

163.     The reliance of Plaintiff and other members of the Class on Defendants to select the Product to fit their particular purpose was reasonable given Defendants' particular knowledge of the products it manufactures and distributes and Defendants' statements and representations in its advertising and labeling concerning the Product's benefits and quality.

50

164.     As a result of the foregoing, Plaintiff and other members of the Class have been damaged in the amount paid for the Product, together with interest thereon from the date of purchase.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues.

**WHEREFORE**, Plaintiff, on behalf of herself and the Class, prays for judgment as follows:

(a)     Declaring this action to be a proper class action and certifying Plaintiff as the representative of the Class under Rule 23 of the FRCP;

(b)     Entering preliminary and permanent injunctive relief against Defendants, directing Defendants to correct their practices and comply with New York law;

(c)     Awarding monetary, treble and punitive damages as well as any other damages permitted by GBL §§ 349 and 350, the Magnusson-Moss Warranty Act, 15 U.S.C. § 2301 et seq. and state and federal common law;

(d)     Awarding Plaintiff and Class Members their costs and expenses incurred in this action, including reasonable allowance of fees for Plaintiff's attorneys and experts, and reimbursement of Plaintiff's expenses; and

(e)     Granting such other and further relief as the Court may deem just and proper.


Dated: February 21, 2017

                                     **THE SULTZER LAW GROUP, P.C.**

                                     By: _____/s/ Jason Sultzer_____
                                     Jason P. Sultzer, Esq. (Bar ID #: JS4546)
                                     Joseph Lipari, Esq. (Bar ID #: JL3194)
                                     85 Civic Center Plaza, Suite 104
                                     Poughkeepsie, New York 12601

Tel: (845) 705-9460
Fax: (888) 749-7747
sultzerj@thesultzerlawgroup.com

*Counsel for Plaintiff and the Class*